UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| SHARON W., | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )  2:21-cv-00287-NT |
| | ) |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant | ) |

## REPORT AND RECOMMENDED DECISION

On Plaintiff's application for disability insurance benefits under Title II and supplemental security income benefits under Title XVI of the Social Security Act, Defendant found that Plaintiff has severe impairments but retains the functional capacity to perform substantial gainful activity. Defendant, therefore, denied Plaintiff's request for disability benefits. Plaintiff filed this action to obtain judicial review of Defendant's final administrative decision pursuant to 42 U.S.C. § 405(g).

Following a review of the record, and after consideration of the parties' arguments, I recommend the Court affirm the administrative decision.

### THE ADMINISTRATIVE FINDINGS

The Commissioner's final decision is the February 26, 2021, decision of the Administrative Law Judge. (ALJ Decision, ECF No. 11-2).[1] The ALJ's decision tracks the familiar five-step sequential evaluation process for analyzing social security disability

---

[1] Because the Appeals Council found no reason to review that decision (R. 1), Defendant's final decision is the ALJ's decision.

claims, 20 C.F.R. §§ 404.1520, 416.920.

The ALJ found that Plaintiff has severe, but non-listing-level impairments consisting of degenerative disc disease, headaches, major depressive disorder, and an anxiety disorder. (R. 18.) The ALJ further found that despite Plaintiff's impairments, Plaintiff has the residual functional capacity (RFC) to perform light work, except she can climb ramps and stairs on an unlimited basis, but can never climb ladders, ropes or scaffolds; she can kneel, crouch and crawl on an unlimited basis, but can stoop occasionally; she can understand and remember simple one- to two-step instructions, and sustain concentration, persistence and pace for simple tasks over the course of a regular workday and workweek with regular breaks; can work alongside coworkers but should avoid tandem tasks; can work alongside supervisors but should avoid social interaction with the general public; and can avoid hazards and make simple plans. (R. 20-21.) Based on the RFC finding, Plaintiff's age, education and work experience, and the testimony of a vocational expert (VE), the ALJ concluded that Plaintiff can perform substantial gainful activity existing in the national economy, including the representative occupations of cleaner/housekeeper, stock checker/scanner, and mailroom clerk. (R. 29-30.) The ALJ determined, therefore, that Plaintiff was not disabled.

### STANDARD OF REVIEW

A court must affirm the administrative decision provided the decision is based on the correct legal standards and is supported by substantial evidence, even if the record contains evidence capable of supporting an alternative outcome. *Manso-Pizarro v. Sec'y of HHS*, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam); *Rodriguez Pagan v. Sec'y of HHS*,

819 F.2d 1, 3 (1st Cir. 1987). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a finding. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Sec'y of HHS*, 647 F.2d 218, 222 (1st Cir. 1981). "The ALJ's findings of fact are conclusive when supported by substantial evidence, but they are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999).

## DISCUSSION

Plaintiff argues (1) the ALJ erred when he failed to find Plaintiff's right arm injury to be a severe impairment at step 2 of the sequential analysis; and (2) the ALJ's determination that Plaintiff can perform jobs which exist in the national economy in significant numbers is not supported by reliable vocational evidence.

### A. Step 2

Plaintiff alleges a disability based in part on chronic pain, tenderness, weakness, and limited range of motion in her right arm resulting from an injury she sustained from a dog bite in 2017. (R. 416-17.)

At step 2 of the sequential evaluation process, a social security disability claimant must establish the alleged conditions are severe, but the burden is de minimis, and is designed merely to screen out groundless claims. *McDonald v. Sec'y of HHS*, 795 F.2d 1118, 1123-24 (1st Cir. 1986). The ALJ may find that an impairment or combination of impairments is not severe when the medical evidence "establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education,

or work experience were specifically considered." *Id.* at 1124 (quoting Social Security Ruling 85–28).  In other words, an impairment is severe if it has more than a minimal impact on a claimant's ability to perform basic work activities on a regular and continuing basis.  *Id.*

Medical evidence is required to support a finding of severe impairment.  20 C.F.R. § 404.1521.  *See also* Social Security Ruling 16-3p, 2017 WL 5180304, at *3 ("An individual's symptoms, such as pain, fatigue, shortness of breath, weakness, nervousness, or periods of poor concentration will not be found to affect the ability to do basic work-related activities for an adult … unless medical signs or laboratory findings show a medically determinable impairment is present.")  A diagnosis, standing alone, does not establish that the diagnosed impairment would have more than a minimal impact on the performance of work activity.  *Dowell v. Colvin*, No. 2:13-cv-00246-JDL, 2014 WL 3784237, at *3 (D. Me. July 31, 2014).  Moreover, even severe impairments may be rendered non-severe through the ameliorative influence of medication and other forms of treatment.  *Parsons v. Astrue*, No. 1:08-cv-218-JAW, 2009 WL 166552, at *2 n.2, *aff'd*, 2009 WL 361193.  In addition, an impairment must meet the 12-month durational requirement to be considered "severe."  20 C.F.R, § 404.1509; *Mulero v. Comm'r of Soc. Sec.*, 108 F. App'x 642, 644 (1st Cir. 2004) (to be severe, impairment must satisfy durational requirement).

In support of her argument, Plaintiff relies principally on the opinion of

consultative examiner Mark Nash, PA-C, who examined Plaintiff on February 15, 2019.[2] PA-C Nash reported that Plaintiff exhibited intermittent hyperesthesia and decreased sensation in her right upper extremity, with reduced range of motion in her shoulder, and that she had difficulty performing fine dexterous movement with her right hand. (R. 522-23.) He rated her right upper extremity strength at 4/5. (R. 523.) PA-C Nash concluded the symptoms might be consistent with nerve injury and assessed limitations that Plaintiff could occasionally lift no more than ten pounds, could occasionally feel with her right hand, and could "never" handle, finger, reach, push, or pull with her right upper extremity "with any sort of regularity." (R. 524.)

Although the ALJ did not address Plaintiff's claimed right arm impairment at Step 2, the ALJ discussed the condition extensively in his RFC assessment. The ALJ found PA-C Nash's opinion "less than fully persuasive," noting that it was inconsistent with the mild strength deficits and neurological abnormalities in her right upper extremity documented by PA-C Nash and other providers, and it was inconsistent with her reports of her daily activities.

Plaintiff also cites the records of her primary treating physician, Dieter Kreckel, M.D., and the limitations on her daily activities as support for her contention that the ALJ erred. In July 2019, Plaintiff's primary care physician, examined Plaintiff and noted tenderness and chronic changes in her right arm, weakness with her right hand grip and with flexion/extension, and pain in her shoulder and right arm. (R. 540.) Dr. Kreckel

---

[2] PA-C Nash's report was reviewed and approved by Fred Fridman, D.O.

observed that Plaintiff had "diffuse" joint problems, "with probable arthritis and also exacerbated by her weight;" he advised her to take ibuprofen for her discomfort. (R. 541.) Plaintiff testified she sometimes has difficulty gripping with her right hand, that her right arm swells, with numbness, tingling and sharp feelings from her right fingertips to her neck and down her right side, and that she has difficulty attending to her personal grooming with her right arm. (R. 46, 48.)

State agency medical consultant at reconsideration, James Hall, M.D., who reviewed both PA-C Nash's consultative report and Dr. Kreckel's records, stated that no right arm impairment was documented and consequently assessed no limitations in the use of the arm. (R. 93.) The ALJ found Dr. Hall's opinion persuasive, concluding that it was "consistent with and supported by the medical evidence of record in its entirety," including treatment notes submitted after Dr. Hall performed his review. (R. 28.) The ALJ found that Plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record …." (R. 21.)

Plaintiff essentially asks the Court to re-weigh the evidence. The Court, however, is not to substitute its judgment for the ALJ's judgment. *Irlanda Ortiz v. Sec'y Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) ("[T]he resolution of conflicts in the evidence is for the [ALJ], not the courts."); s*ee also*, *Brown v. Astrue*, No. 2:10-cv-27-DBH, 2010 WL 5261004, at *3 (D. Me. Dec. 16, 2010) (*aff'd*, Jan. 4, 2011) (ALJs are entitled to resolve conflicts in the medical evidence). The ALJ supportably discounted PA-C Nash's opinion and supportably relied on the assessment of Dr. Hall, who reviewed

both PA-C Nash's consultative report and Dr. Kreckel's records. The ALJ also adequately discounted Plaintiff's statements regarding the severity of her symptoms and their effect on her functioning. The ALJ, therefore, did not err at Step 2.

Even if the ALJ erred because he failed to find Plaintiff's right arm condition to be a severe impairment, the error would be harmless. The ALJ plainly considered the symptoms and limitations allegedly resulting from the arm condition in his RFC assessment. The ALJ's RFC assessment is supported by substantial evidence on the record and thus Plaintiff has failed to establish that additional restrictions are necessary. *See Socobasin v. Astrue,* 882 F. Supp. 2d 137, 142 (D. Me. 2012) (citing *Bolduc v. Astrue,* No. 09–CV–220–B–W, 2010 WL 276280, at *4 n. 3 (D. Me. Jan. 19, 2010) ("[A]n error at Step 2 is uniformly considered harmless, and thus not to require remand, unless the plaintiff can demonstrate how the error would necessarily change the outcome of the plaintiff's claim.")); *see also McDonald v. Soc. Sec. Admin. Comm'r*, No. 1:09-cv-473-JAW, 2010 2680338, at *5 (D. Me. June 30, 2010).

**B. Vocational Evidence**

At step 5 of the evaluation process, the Commissioner has the burden to establish that the jobs a claimant can perform exist in the national economy in significant numbers, giving particular attention to the claimant's age, education, work experience, and RFC. 20 C.F.R. § 404.1520(a)(4)(v), (g)(1); *Goodermote v. Sec'y of HHS*, 690 F.2d 5, 7 (1st Cir. 1982). This burden is typically addressed through a combined reliance on the Medical-Vocational Guidelines, 20 C.F.R. Part 202, Subpart P, Appendix 2, and the testimony of a vocational expert, who is asked to consider one or more hypothetical RFC

findings. *Goodermote*, 690 F.2d at 7; *Arocho v. Sec'y of HHS*, 670 F.2d 374, 375 (1st Cir. 1982). The Supreme Court noted that when offering such testimony, vocational experts "may invoke not only publicly available sources but also 'information obtained directly from employers' and data otherwise developed from their own 'experience in job placement or career counseling.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152-53 (2019) (quoting SSR 00-4p, 65 Fed. Reg. 75760 (2000)). The Court further observed that the sufficiency of the evidence threshold necessary to support an ALJ's factual determinations, including the assessment of vocational expert testimony, "is not high." *Id.* at 1154.

Plaintiff submitted a post-hearing vocational affidavit from vocational consultant David Meuse, MS, CRC, challenging the testimony of the VE at the hearing. (Meuse Affidavit, R. 376-77.) Mr. Meuse asserts that two of the jobs identified by the VE, mailroom clerk and stock checker, exceed the RFC adopted by the ALJ:

> Occupations in the DOT are rated for their required General Educational Development (GED) Reasoning level on a scale of 1 (lowest) to 6 (highest). The Revised Handbook for Analyzing Jobs (RHAJ) Ch. 7 defines level 1 as "Apply commonsense understanding to carry out simple one-or-two-step instructions…." Thus, the RFC limitation to 1- to 2-step instructions limits the individual to Reasoning level 1 occupations. Stock Checker is described with a Reasoning level 2 and Mail Clerk with Reasoning level 3, and so both are precluded by the RFC.

(Meuse Affidavit ¶ 11, R. 377.)

Plaintiff argues that the ALJ did not acknowledge or discuss the alleged conflict between the DOT and the VE's testimony. Social Security Rule 00-4p "imposes an *affirmative obligation* on [ALJs] to (i) inquire whether there is any conflict between [VE]

testimony and the DOT, (ii) elicit a reasonable explanation for any apparent conflict, and (iii) resolve said conflict, regardless of how it was identified." *Burton v. Astrue*, No. 2:11-cv-174-GZS, 2012 WL 1184425, at *4 (D. Me. Apr. 6, 2012), *rec. dec. adopted*, 2012 WL 1415616 (D. Me. Apr. 24, 2012) (emphasis in original). The obligation to inquire, however, "pertains only to *apparent* conflicts, [and] a claimant waives a claim of failure to identify and resolve [such] a conflict … unless he or she 'can show that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance[.]'" *Welch v. Astrue*, No. 1:11-cv-384-GZS, 2012 WL 3113148, at *7 (D. Me. July 11, 2012) (quoting *Burton*, 2012 WL 1184425, at *4 n.3) (emphasis in original).

This Court has repeatedly found no conflict with the GED reasoning level of the jobs here and the RFC limitation to simple instructions. *See Brett J. v. Saul*, No. 1:19-cv-00270-DBH, 2020 WL 3567155, at *5 (D. Me. June 30, 2020) (*aff'd*, Aug. 17, 2020) (no conflict with limitation to simple one- or two-step instructions and GED reasoning level 2); *Allison P. v. Berryhill*, No. 2:18-cv-00061-JHR, 2019 WL 1373646, at *5 (D. Me. Mar. 24, 2019) (same); *Welch*, 2012 WL 3113148, at *3-7 (no conflict between limitation to simple work and GED reasoning level 3). Moreover, as noted in *Welch*, "even if there was a conflict between the limitation to simple, repetitive instructions at issue in this case and GED reasoning level 3, the plaintiff falls short of showing that it was 'apparent' for purposes of SSR 00-4p." 2012 WL 3113148, at *7.

Mr. Meuse also opined that the VE's job numbers were unreliable because the VE

relied upon the Occupational Employment Quarterly (OEQ) without any adjustments.[3] (R. 377 ¶¶ 13-14.)  Mr. Meuse maintains that the use of OEQ data without adjustment or analysis is contrary to the publisher's instructions.  (*Id*. ¶ 14.)   He also asserts that the OEQ uses "an assumption regarding job distribution that is arbitrary, that has no relationship to actual labor market conditions."  (*Id*. ¶ 13.)   He contends the OEQ aggregates multiple DOT Code jobs with differing requirements as to reasoning and other factors.  (*Id*.)

>The VE testified as follows regarding the basis of his job numbers:
>
>Q  ….  And how do you estimate the job numbers?
>
>A  Well, I usually start with the United States Department of Labor and at the starting point because oftentimes it's a grouping of jobs.  Then, I take that number and I cross reference it with the Occupational Employment Quarterly, which does a more detailed breakout of the jobs by skill level, exertion level, so on and so forth.  I also use the Occupational Employment Handbook.
>
>And then, if there's a discrepancy say percentage-wise, sometimes I would reference the New York State Department of Labor just to see if, for instance, if – I'll give you an example.  You get a wrong number for security guards.  And then you look for a breakout for how many of those guards are gate guards, in other words, signing in NSV (PHONETIC) or vehicle traffic versus doing patrols.  If there was a big discrepancy there, I would go to the New York State Department of Labor and see if a (INAUDIBLE) is involved.
>
>Q  Okay.  Now, if you said you would also use the Occupational Employment Handbook.  What do you use that for?
>
>A  It's the quarterly, it's actually like a newsletter.  Well, I use that, again, to get a more detailed breakout.  Let me use another example,

---

[3] Mr. Meuse states that he "consider[s] SkillTrans Job Browser Pro vocational software to be a reliable source of job numbers," but he does not provide job numbers from that source for the three positions the ALJ identified. (R. 376-77 ¶¶ 8, 13-14.)

10

    cashiers, for –

    Q  I'm sorry.  Pardon me for interrupting.  I didn't mean the Occupational Employment Quarterly.  You made reference to the Occupational Employment Handbook.

    A  Oh, the Occupational Employment Handbook.

    Q  Oh okay.

    A  Yeah.  Those are two different things.  The handbook is actually similar in size to the DOT.

    Q  Yes.

    A  Yeah.  Well, that one I use – again, a good example of utilizing that one would be, for instance, cashiers.  Well, half of all cashiering positions are part-time.  And they would identify that, and you would eliminate those numbers.  Then, there's cashiers in a gift shop.  Those are two different cashiering positions.

    Q  Yeah.

    A  And one is SVP: 3, the one is SVP: 2.  So, that book can clarify that as well as so can the Occupational Employment Quarterly.

    Q  Okay.  In these instances, the numbers you've cited today, have you made any adjustments from the results you get from the OEQ, the Occupational Employment Quarterly?

    A  No.  Actually, I haven't updated the numbers since prior to the Coronavirus because, of course, those numbers are going to be very skewed for the time being.  My hope is those numbers will return, be more valid, going forward.

(R. 63-64.)

    First, an ALJ can permissibly consider information from the OEQ.[4]  Although the

---

[4] *See Dishman v. Colvin*, No. 2:16-cv-00082-JAW, 2016 WL 7477540, at *5 (D. Me. Dec. 29, 2016), *clarified*, 2017 WL 238419 (D. Me. Jan. 19, 2017), *aff'd*, 2017 WL 499892 (D. Me. Feb. 7, 2017), where the Court noted that the plaintiff in that case "repeats an argument that has been made several times in this

OEQ is not subject to administrative notice as a government source under 20 C.F.R. §§ 404.1560(b)(2), 404.1566(d), 416.960(b)(2), and 416.966(d), it is not excluded as a source for job information. The regulations provide that ALJs can rely on "other publications" for such information. 20 C.F.R. §§ 404.1566(d), 416.966(d). Moreover, the OEQ data is itself drawn from government census data. Under 20 C.F.R. §§ 404.1560(b)(2), 404.1566(d), an ALJ is permitted to take judicial notice of Census Bureau reports.

Furthermore, the record does not support Plaintiff's contention that the ALJ relied solely on the OEQ job data. The VE explained the process he follows, which includes referencing other sources, such as the United States Department of Labor and the Occupational Employee Handbook. A fair and reasonable interpretation of the VE's testimony is that after consulting other reliable sources, he concluded the job numbers derived from the OEQ were reasonable. The ALJ, who cited the VE's "methodology" and his "professional knowledge and experience in job placement," supportably relied on the VE's testimony.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court affirm the administrative

---

court, without success: that the [VE]'s use of the … OEQ … as a source for estimating the numbers of particular jobs available nationally renders his testimony about those numbers invalid." (citing *Small v. Colvin*, No. 1:12-cv-236, 2012 WL 1912892, at *7-8 (D. Me. Mar. 309, 2013); *see also Hardin v. Berryhill*, No. 8:18-CV-84-T-AEP, 2019 WL 927173, at *5 (M.D. Fla. Feb. 26, 2019) (VE properly relied on the OEQ); *Swincki v. Astrue*, No. 07-13596, 2009 WL 728544, at *19 (E.D. Mich. Mar. 19, 2009) (holding that, because the OEQ "is based on other government publications or data, of which the Agency generally takes administrative notice," VE testimony reliable); *Pritchett v. Astrue*, No. 5:09-CV-155(CAR), 2009 WL at 4730326, *6 (M.D. Ga. Dec. 4, 2009) (same) (collecting cases).
.

decision.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 14th day of July, 2022.